**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **MARK R. DAVID,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:14-CV-00155** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Mark R. David appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for Supplemental Security Income ("SSI").[1] (*See* Docket # 1.)  For the

following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

David applied for SSI in January 2011, alleging disability as of January 26, 2011.[2] (Tr.

69, 181.)  The Commissioner denied his application initially and upon reconsideration. (Tr. 69-

70.)  David requested a hearing, but was incarcerated at the time and could not appear. (Tr. 133.)

On June 28, 2012, Administrative Law Judge Whitfield Haigler, Jr. ("ALJ"), dismissed David's

request for hearing due to his failure to appear (Tr. 71-75), and David appealed that dismissal to

---

[1] All parties have consented to the Magistrate Judge. (Docket # 16); *see* 28 U.S.C. § 636(c).

[2] David initially applied for Disability Insurance Benefits ("DIB") as well, but his insured status expired in September 2004 and his alleged onset date is not until January 2011. (Tr. 193-201); *see* 20 C.F.R. § 404.101(a) (explaining that to qualify for DIB, a claimant must prove, among other things, that he became disabled prior to the expiration of his insured status).  Therefore, David has abandoned his DIB claim.

the Appeals Council (Tr. 133).

On August 3, 2012, the Appeals Council remanded the case to the ALJ with instructions to determine whether David had a "good reason" for failing to appear at his hearing. (Tr. 76-78.) After finding that David's incarceration constituted good cause for failure to appear, the ALJ held a hearing on January 28, 2013, at which David, who was represented by counsel, and a vocational expert testified. (Tr. 31-67.)

On February 7, 2013, the ALJ rendered an unfavorable decision to David, concluding that he was not disabled because he could perform a significant number of light work jobs in the economy. (Tr. 14-25.) After the Appeals Council denied David's request for review, the ALJ's decision became the final decision of the Commissioner. (Tr. 8-12.)

David filed a complaint with this Court on May 21, 2014, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, David alleges that the ALJ: (1) improperly discounted the credibility of his symptom testimony; and (2) failed to adequately account for his vertigo when assessing his residual functional capacity ("RFC"). (Social Security Opening Br. of Pl. 7-14.)

## II. FACTUAL BACKGROUND[3]

### A. Background

At the time of the ALJ's decision, David was fifty years old and had obtained his GED, a six-month technical certificate in custodial maintenance, and an associate's degree in private security. (Tr. 40, 42, 181, 223.) He had a limited work history with rather brief stints as a factory laborer, construction worker, and restaurant cook (Tr. 230); and a history of multiple

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 509-page administrative record necessary to the decision.

incarcerations (Tr. 194).

*B. David's Testimony at the Hearing*

At the hearing, David, who was five feet ten inches tall and weighed 185 pounds, testified that he lives with his wife. (Tr. 41.) In a typical day, he experiences fatigue, and thus, often naps for an hour or two in the afternoon; he attributes this to his blood pressure medication. (Tr. 54, 56-57.) About eight days a month, he feels so fatigued that he "can't get up" or "stay awake." (Tr. 56-57.)

David testified that he suffers from constant knee pain. (Tr. 45, 47.) He estimated that he could stand for ten to fifteen minutes before needing to sit; walk for 100 feet before resting; and sit for fifteen minutes before needing to change positions. (Tr. 45-47.) He stated that he has some difficulty maintaining his balance due to his knee problems, and his knee pain wakes him several times a night. (Tr. 47-48, 52.) He rated his knee pain as a "six" on ten-point scale, stating that it reduces to a "four" or "five" with medication. (Tr. 48-49.) David takes anti-inflammatories for his pain, but no narcotics; he complained of medication side effects of upset stomach, constipation, and diarrhea. (Tr. 49.) He wears an over-the-counter knee brace when he has an abnormal amount of pain. (Tr. 53.)

David, who is left-handed, further testified that in November 2011 he underwent a fusion of his left wrist and hand, together with a carpal tunnel release. (Tr. 49, 51.) As a result, his left wrist is "kind of locked into one position." (Tr. 50.) He claimed can grip a screwdriver, but not tight enough to turn it; can print at a slow pace, but cannot type or write in cursive; has difficulty turning a steering wheel when driving; and cannot turn a doorknob or lift a gallon of milk with his left hand. (Tr. 50-51, 57.) He also experiences some carpal tunnel symptoms in his right

3

wrist, but is trying to "avoid doing anything" because of his left wrist limitations. (Tr. 55, 58.)

In addition, David complained of feeling dizzy and seeing "white floating lights in [his] eyes" when he stands up after sitting for a long while; these symptoms typically last from five to ten minutes. (Tr. 52.)  To cope, when rising from sit to stand he "stand[s] still, hold[s] onto something[,] and wait[s] for [his] vision to come back." (Tr. 52-53.)  He takes Antivert for these symptoms, which helps "for the most part." (Tr. 21.)  He added that before Antivert, he "would black out and fall" if he tried to stand too quickly. (Tr. 53.)  His reported that his wife showers with him to make sure that he does not fall. (Tr. 53.)

### C. Summary of the Relevant Medical Evidence

In 1994, David injured his left knee in a fall, and he underwent surgery in 1995 to repair a torn anterior cruciate ligament and medial meniscus. (Tr. 290-92, 296-98.)

On February 5, 2009, David complained of dizziness and nausea; he was treated with Phenergan, after which his symptoms improved. (Tr. 334-36.)  One week later, David saw Dr. Mark Charpentier for similar complaints. (Tr. 332-33.)  He diagnosed David with vertigo (poor control) and prescribed Meclizine (a generic drug for Antivert). (Tr. 332-33.)  In October 2009, David again complained of dizziness to Dr. Charpentier, who noted that David had benign positional vertigo. (Tr. 319-20.)  David had a normal exam, including normal neurological findings, and was prescribed Dramamine. (Tr. 320.)

In January 2010, David complained of experiencing daily episodes of vertigo lasting from one to four minutes. (Tr. 312-13.)  He had a normal examination, and his medications, including Antivert and Naproxen, were continued. (Tr. 312-13.)  In April 2010, David complained to Dr. Charpentier of knee pain, yet stated that he had no difficulty with exercise.

4

(Tr. 305.) Dr. Charpentier observed that David had minimal pain and normal range of motion; he continued David's medications. (Tr. 305-06.) He further noted that David's benign positional vertigo was controlled with medication. (Tr. 305-06.)

In September 2010, David complained that his vertigo had returned with ringing in his ears; he admitted that he had stopped taking his Antivert in August. (Tr. 358.) In October, David reported increased joint pain, mostly in his wrists, after he ran out of Naproxen. (Tr. 357.) In November, David stated that he was "doing well" and that the Antivert "help[ed] to keep the edge off." (Tr. 356.) He did, however, have some pain in his left hand. (Tr. 356.)

In March 2011, David underwent a surgical repair of an umbilical hernia. (Tr. 370-74, 504.) His recovery was uneventful. (Tr. 482.)

On March 23, 2011, Dr. H.M. Bacchus, a state agency physician, examined David for purposes of his disability application. (Tr. 375-78.) He had an antalgic gait, favoring his left knee; difficulty with heel, toe, and tandem walk due to complaints of pain and dizziness; and was somewhat unsteady with ambulatory and range of motion maneuvers. (Tr. 376.) He was unable to left hop, but could squat one-third way down with support; he was slow to rise. (Tr. 376.) He had pain with palpation and range of motion of his left knee; his gait was slower in nature, but sustainability appeared fair on even ground. (Tr. 376.) Muscle strength and tone in his extremities and grip strength were 4/5 on the left and 5/5 on the right; his fine and gross dexterity were slower in nature, but appeared preserved. (Tr. 376.) Dr. Bacchus concluded that David was limited in repetitive squatting, climbing, and walking on uneven ground; had difficulty with any kneeling or crawling; and should avoid working in unprotected heights or climbing ladders due to his balance issues. (Tr. 377.)

On March 29, 2011, Dr. Jonathon Sands, a state agency physician, reviewed David's record and concluded that he could lift twenty pounds occasionally and ten pounds frequently; stand or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and avoid unprotected heights and hazardous machinery. (Tr. 384-391.) He noted that David's benign positional vertigo was treated with Antivert and was controlled. (Tr. 385.) Dr. Sands's opinion was later affirmed by a second state agency physician, Dr. B. Whitley. (Tr. 406.)

In July 2011, David saw Dr. Jerry Mackel of Fort Wayne Orthopaedics for complaints of pain, numbness, and weakness in his left hand and wrist; and pain, weakness, and a "giving way sensation" in his left knee. (Tr. 410.) As to his wrist, x-rays showed significant, but not severe, degenerative arthritis. (Tr. 410.) Dr. Mackel opined that David's complaint of left wrist weakness was "a combination of arthritis of the wrist of mild-to-moderate severity and early intermittent carpal tunnel symptoms." (Tr. 410.) He prescribed night splinting and an injection to the carpal tunnel. (Tr. 410.) X-rays of David's knee appeared normal with good joint space and no lytic or blastic changes. (Tr. 411.) Dr. Mackel suspected that Dave had some early arthritic changes, so he injected his knee and recommended use of a knee brace. (Tr. 411.)

In November 2011, Dr. Niles Schwartz performed a full arthrodesis of David's left wrist and a carpal tunnel release. (Tr. 375.) By March 2012, David told Dr. Schwartz that all his pain was gone, he had no complaints, and that he had been doing his activities without an issues. (Tr. 455.) Dr. Schwartz noted that David had good grip strength, but some decreased sensation in his fourth and fifth fingers. (Tr. 455.) He instructed David to continue his activities as tolerable. (Tr.

455.)

David saw Dr. Hanna in April and May 2012, complaining of significant burning pain in his left knee. (Tr. 456-58.) David rated his pain a "six" on a ten-point scale. (Tr. 456.) Dr. Hanna observed that David had near full range of motion with mild pain in flexion, mild medial and lateral joint line tenderness, and moderate patellofemoral crepitus with moderate pain on patellofemoral grind. (Tr. 456.) The knee was grossly stable. (Tr. 456.) An MRI showed mild tricompartmental osteoarthritis and mild effusion, but was otherwise normal. (Tr. 426.)

In July 2012, David underwent a left knee arthroscopy with chondroplasty. (Tr. 485-87.) After participating in six weeks of physical therapy , Dr. Hanna wrote that he was "doing well"; had occasional knee pain, rating it a "one" on a ten-point scale; and was occasionally taking Tylenol. (Tr. 447.) Dr. Hanna noted that David had good motion and strength and no instability. (Tr. 447.) He stated that David could be released to activities as tolerated, using pain as his guide. (Tr. 447.) More specifically Dr. Hanna completed a restriction worksheet, stating that David was to return to work "full duty, but limit deep squatting and bending." (Tr. 447.)

In December 2012, David returned to Dr. Schwartz with complaints of increased pain in his left wrist. (Tr. 445.) He reported that he had a new job in which he rolled and delivered newspapers, driving eighty miles each day. (Tr. 445.) Upon examination, he had mild tenderness over a portion of his wrist tendons; otherwise, his exam was normal. (Tr. 445.) Dr. Schwartz recommended that David use his right hand to deliver newspapers and reduce activity with his left hand, and to use anti-inflammatories and ice as needed. (Tr. 445-46.) An x-ray showed intact hardware and mild to moderate osteoarthritic changes. (Tr. 423, 428.)

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## IV. ANALYSIS

### A. *The Law*

Under the Act, a plaintiff is entitled to SSI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

In determining whether David is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

### B. The ALJ's Decision

On February 7, 2013, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 17-25.) He found at step one of the five-step analysis that David had not engaged in substantial gainful activity after his application date. (Tr. 19.) At step two, he determined that David had the following severe impairments: status post left knee surgery, status post left carpal tunnel surgery, status post hernia, and hypertension. (Tr. 19.) At step three, the ALJ determined that David's impairment or combination of impairments were not

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 416.920(e), 416.945. The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 416.920(e), 416.945(a)(5).

severe enough to meet a listing. (Tr. 20-21.)

Before proceeding to step four, the ALJ determined that David's symptom testimony was not credible to the extent it portrayed limitations in excess of the following RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except no climbing on ladders, ropes and scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; and only occasional walking on non-level ground. The claimant is limited to occasional gross handling, fine finger manipulation and feeling sensation, and handwriting or keyboard work. The claimant is to avoid all exposure to unprotected heights or being around dangerous equipment or products.

(Tr. 21.)

David had no relevant past work to consider at step four. (Tr. 23.) Based on the assigned RFC and the vocational expert's testimony, the ALJ concluded at step five that he could perform a significant number of unskilled, light work jobs in the economy, including counter clerk (17,500 jobs nationally and 525 regionally) and ticket takers/usher (21,000 jobs nationally and 230 regionally). (Tr. 24.) Accordingly, David's claim for SSI was denied. (Tr. 24.)

### C. The ALJ's Credibility Determination Will Not Be Disturbed

In challenging the Commissioner's denial of benefits, David first argues that the ALJ was "patently wrong" in finding that his symptom testimony was "not entirely credible." (Tr. 22.) For the following reasons, the ALJ's credibility assessment will not be disturbed.

An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and

logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

1. Objective Medical Evidence

The ALJ considered several factors when assessing David's credibility, beginning with the objective medical evidence. The ALJ observed that an MRI of David's left knee in April 2012 showed mild tricompartmental osteoarthritis; that he had a left knee arthroscopy with chondroplasty in July 2012; and that by September 2012, he was discharged from physical therapy after meeting his goals. (Tr. 22.) The ALJ further recited that David had a left carpal tunnel release and plate with a fusion of carpals in November 2011, and that at a recent medical appointment David complained of some left wrist pain after rolling newspapers and delivering them in his car. (Tr. 22.) David's examination, however, was normal, except for some mild tenderness over the extensor tendons, and the physician recommended he reduce his activity with left hand. (Tr. 22.)

David challenges the ALJ's consideration of this medical evidence, asserting that the ALJ failed to adequately explain how it undercuts the credibility of his symptom testimony. But the ALJ needs only to minimally articulate his analysis of the evidence to allow this Court to trace the path of his reasoning. *Zurawski*, 245 F.3d at 888. Here, the ALJ satisfied this standard.

The ALJ observed that in September 2012, six weeks after knee surgery, David was discharged from physical therapy, having met his goals. The therapy discharge summary reflects

normal knee strength, good balance, 125 degrees of active knee flexion, and no mention of pain. (Tr. 495.)  This documentation contrasts with David's hearing testimony just four months later of disabling knee pain.  "[A]lthough an ALJ may not ignore a claimant's subjective reports of pain simply because they are not fully supported by objective medical evidence, discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, (7th Cir. 2008).

David also argues that the ALJ selectively cited the physical therapy discharge summary, emphasizing that the ALJ ignored a September 2012 note from Dr. Hanna that "restricted him to 'limited activity' and recommended that [he] 'use pain as his guide.'" (Opening Br. 11 (citing Tr. 447)); *see generally Denton v. Astrue*, 596 F.3d 419, 435 (7th Cir. 2010) ("[A]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

But in making this argument, David has curbed Dr. Hanna's note; in actuality, Dr. Hanna stated:

> [David] is doing well.  He notes pain is occasionally 1/10 in the knee.  He is occasionally taking Extra Strength Tylenol, but overall doing well.  No problems with the incision.  Good range of motion and strength.  He has basically completed physical therapy.  No instability.  No other complaints.
>
> . . . .
>
> He is doing very well.  I think he can be released to activities as tolerated with pain as his guide.  We did g[i]ve him [a] work restriction sheet that he can be full duties, but he should limit the amount of deep squatting and kneeling due to his patellofemoral compartment issues.  However, some of this limited activity should be fine for him and he should use pain as his guide.

(Tr. 447.)  Dr. Hanna then completed a Restriction Worksheet, confirming that David "[m]ay work full duty, but limit deep squatting and bending." (Tr. 448.)  Therefore, David's argument

that the ALJ selectively cited the medical evidence concerning his knee is unsupported. "[A]n ALJ need not mention every piece of evidence, so long [as] he builds a logical bridge from the evidence to his conclusion," *Denton*, 596 F.3d at 425; here, the ALJ has adequately done so.

The Court is also able to trace the ALJ's reasoning about the objective medical evidence pertaining to David's left hand and wrist. The ALJ cited a December 2012 note from Dr. Schwartz reflecting that David complained of some left wrist pain in his job rolling and delivering newspapers, which involved driving eighty miles a day; an examination, however, was normal, other than some mild tenderness over his extensor tendons. (Tr. 22 (citing Tr. 445).) Dr. Schwartz then instructed David to decrease his left hand activity and take anti-inflammatories. (Tr. 445.) The ALJ reasoned from this evidence that although David indeed had some left hand limitations, they did not rise to the level of a disabling condition as David portrayed; the ALJ then reasonably limited David to only "occasional gross handling, fine finger manipulation and feeling sensation, and handwriting or keyboard work." (Tr. 21-22.)

Therefore, the Court is able to trace the ALJ's reasoning with respect to the objective medical evidence. *Denton*, 596 F.3d at 425.

2. Work History

Furthermore, the ALJ did not discount David's credibility on the objective medical evidence alone. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); 20 C.F.R. §416.929(c)(2); SSR 96-7p, 1996 WL 374186, at *6. Rather, the ALJ also cited David's limited work history when determining that his symptom testimony was less than fully credible. (Tr. 22; *see* Tr. 38-39, 43-45, 201-02.)

David argues that before drawing a negative inference from his minimal work history, the

ALJ should have examined *why* his work history was limited.  More specifically, David asserts

that the ALJ failed to consider that he was unable to work from 2000 to 2002, November 2005 to

November 2006, and 2008 through September 2010 for the reason that he was incarcerated.

(Opening Br. 10 (citing Tr. 191, 194).)

But the ALJ did consider that David served "several jail terms." (Tr. 22.)  Accordingly, it

is reasonable to infer that the ALJ contemplated how David's multiple incarcerations affected his

earnings for the past fifteen years. *See Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985) ("If

a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion

enables us to trace the path of the ALJ's reasoning, the ALJ has done enough.").

Moreover, David makes no attempt to explain in his opening brief why his earnings were

weak for the ten years of the relevant period that he was *not* incarcerated.  In his reply brief,

David asserts that after 2010 he could not "pass the physical" because of his physical limitations,

but that still leaves no explanation for all the years of weak earnings prior to 2010 that David

was not incarcerated. (*See* Tr. 201-02.)

Based on this record, the ALJ was not "patently wrong" in considering David's limited

work history as one factor in his credibility determination. *See McCurrie v. Astrue*, 401 F. App'x

145, 149-50 (7th Cir. 2010) (unpublished) (discounting a claimant's complaints where his work

history prior to his alleged onset date was sporadic); *McDowell v. Astrue*, No. 1:12-cv-3519,

2013 WL 3337795, at *11 (N.D. Ill. July 2, 2013) ("We would have liked to see the ALJ give

further explanation for how [the claimant's] work history played in to the overall credibility

determination, but the ALJ's choice not to do so does not constitute legal error."); *Fahnel v.

Barnhart*, No. 04-C-606C, 2005 WL 331742, at *11-12 (W.D. Wis. Feb. 7, 2005) (finding that

the ALJ could reasonably rely on plaintiff's poor work record as a basis to discount his claimed disability).

3. Criminal History

The ALJ also considered as a factor in his credibility assessment that David had served "several jail terms." (Tr. 22.)  Although David acknowledges that a claimant's criminal history is an appropriate factor to consider when assessing credibility, he contends that an ALJ "must consider the nature of the criminal history and the claimant's transparency regarding it" and "must explain *why* a claimant's criminal history makes the claimant less credible in each case." (Opening Br. 7-8 (emphasis in original).)

David's argument overreaches.  Although a claimant's criminal record alone is not an adequate basis on which to find him incredible, it is not improper for an ALJ to consider criminal convictions "as part of the totality of circumstances when determining credibility." *Vreeland v. Astrue*, No. 06-C-466-C, 2007 WL 5414923, at *13 (W.D. Wis. Mar. 27, 2007); *see also Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999); *Large ex rel., S.L. v. Colvin*, No. 12 C 50101, 2013 WL 2458348, at *7 (N.D. Ill. June 6, 2013); *Mitchell v. Astrue*, No. 1:11-cv-161, 2012 WL 1100251, at *9 (S.D. Ind. Mar. 30, 2012); *Cirelli v. Astrue*, 751 F. Supp. 2d 991, 1008 (N.D. Ill. 2010).  And contrary to David's assertion, the case law does not reveal that an ALJ is *required* to expressly discuss the nature of the conviction or the claimant's truthfulness in revealing it.[5] *See Butera*, 173 F.3d at 1055; *Large ex rel., S.L. v. Colvin*, No. 12 C 50101, 2013 WL 2458348, at *7 (N.D. Ill. June 6, 2013); *Mitchell*, 2012 WL 1100251, at *9; *Cirelli*, 751 F. Supp. 2d at 1008;

---

[5] The Commissioner also argues that a felony criminal conviction is admissible under Federal Rule of Evidence 609(a)(1) regardless of the nature of the crime. (Def.'s Mem. in Supp. of Commissioner's Decision 13.) But the Federal Rules of Evidence do not apply to the admission of evidence in Social Security administrative proceedings. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (collecting cases).

*Vreeland*, 2007 WL 5414923, at *13.

Indeed, this is not a case in which the claimant purports his criminal history stems from his alleged disabling conditions, and as such, could arguably be viewed as a factor supporting his claim of disability. *See, e.g.*, *Troop v. Astrue*, No. 09-cv-803, 2010 WL3808916, at *6 (E.D. Wis. Sept. 24, 2010) (arguing, unsuccessfully, that the claimant's drug-related convictions should be viewed as a symptom of her mental illness, and thus, should not cut against her credibility). Nor is it a circumstance where the claimant's criminal convictions are long past; rather, David's most recent jail term was 2008 through September 2010. *Cf. Davidson v. Colvin*, No. 2:12-cv-293, 2014 WL 1047917, at *14 (N.D. Ind. Mar. 17, 2014) (finding error where the ALJ discredited the claimant for twenty-year-old drug convictions and the claimant went on to build a long work history after release from prison).

Because the ALJ considered David's criminal convictions as just one factor in his credibility determination, there is no reversible error. *See Berger v. Astrue*, 516 F.3d 539, 545-46 (7th Cir. 2008) (affirming the ALJ's credibility determination because it was not "patently wrong" or "divorced from the facts contained in the record").

4. <u>Treatment History</u>

The ALJ also considered as part of his credibility analysis the treatment that David had undergone for his various medical conditions. Specifically, the ALJ reviewed David's surgeries and, as discussed above, his course of physical therapy, which appeared successful. (Tr. 22-23.) He noted David's testimony that he takes Antivert for vertigo, which was controlled, and Tylenol and Naproxen for his pain; but found his testimony "vague" concerning his need to nap as a side effect of his blood pressure medication. (Tr. 22-23, 54.) The ALJ further observed that although

16

David complained of some right wrist and hand symptoms, he had not participated in any treatment for his right wrist or hand. (Tr. 22.)

David does not contend with any particularity that the ALJ mishandled his treatment history. And the Social Security "regulations expressly permit the ALJ to consider a claimant's treatment history" when assessing the credibility of his symptom testimony. *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (discounting the severity of claimant's complaints where his treatment was "relatively conservative" and "inconsistent with [his] complaints"); *Ellis v. Astrue*, No. 2:09-cv-145, 2010 WL 3782265, at *20 (N.D. Ind. Sept. 30, 2010) (affirming the ALJ's discounting of claimant's complaints given the discrepancies between her self-reported symptoms and the lack of treatment for the purported condition); 20 C.F.R. § 416. 929(c)(3); SSR 96-7p, 1996 WL 374186, at *7-8. Accordingly, the Court finds no error with the ALJ's consideration of David's treatment as a factor in his credibility determination.[6]

In the end, "an ALJ's credibility assessment will stand as long as there is some support in the record." *Berger*, 516 F.3d at 546 (citation and internal quotation marks omitted). Here, the ALJ sufficiently supported his assessment of David's credibility through several factors, all which withstand scrutiny. Therefore, the ALJ's credibility determination will not be disturbed.

### D. The RFC Assigned by the ALJ Is Supported by Substantial Evidence

Next, David argues that the RFC assigned by the ALJ is not supported by substantial evidence. Ultimately, David's second argument fares no better than his first.

---

[6] The ALJ also reviewed David's activities of daily living earlier in his decision, finding no significant limitations. (Tr. 20); 20 C.F.R. § 416.929(c)(3)(i) (stating that an ALJ is entitled to consider a claimant's daily living activities as a factor in his credibility analysis). And the ALJ considered the medical opinion evidence, which will be discussed in more detail *infra*, ultimately crediting the opinion of the state agency physicians over David's unsupported symptom testimony. *See generally Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (unpublished) ("[W]e read the ALJ's decision as a whole and with common sense." (citations omitted)).

As stated earlier, the RFC is a determination of the tasks a claimant can do despite his limitations. 20 C.F.R. § 416.945(a)(1). The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p, 1996 WL 374183, at *5; *see* 20 C.F.R. § 416.945.

To review, the ALJ assigned David an RFC for a limited range of light work, which involves lifting no more than twenty pounds at a time with frequent lifting or carrying of items weighing up to ten pounds. 20 C.F.R. § 416.967(b). A job is considered light work when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm and leg controls. 20 C.F.R. § 416.967(b). The ALJ reduced this category further by assigning David additional limitations: no climbing on ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling crouching, crawling, and walking on non-level ground; occasional gross handling, fine finger manipulation and feeling sensation, and handwriting or keyboard work; and no exposure to unprotected heights or dangerous equipment or products. (Tr. 21.)

David argues, however, that "[h]ad the ALJ properly assessed [his] credibility and RFC, [the ALJ] would have found him limited to a sedentary RFC with extremely limited use of his dominant hand." (Reply Br. of Pl. 5.) In doing so, David asserts in his opening brief that the ALJ "neither acknowledged nor accounted for David's vertigo, and he provided no reason for this omission." (Opening Br. 13.)

But as the Commissioner points out, the ALJ did indeed consider David's vertigo. Specifically, the ALJ considered David's testimony that he takes Antivert for dizziness (Tr. 22), Dr. Sands's notation that David "has vertigo that is treated with Antivert" (Tr. 23 (citing Tr. 385)), and an examination at New Castle Correctional indicating that David has "[b]enign positional vertigo that is controlled" (Tr. 23 (citing Tr. 385)). Moreover, the ALJ afforded significant weight to the opinion of Dr. Sands, who after considering David's vertigo, assigned him limitations indicative of a reduced range of light work and an instruction to avoid all exposure to unprotected heights and dangerous equipment or products. (Tr. 23 (citing Tr. 384-91).)

In the face of this evidence, David backtracks in his reply brief. He states that his initial argument was based on a misreading of the record, conceding that the ALJ "arguably accounted for David's vertigo in his RFC assessment." (Reply Br. 5 n.2.) Hoping to rehabilitate his argument, David argues in his reply brief that if the ALJ had "*properly* accounted for" his vertigo, the ALJ would have restricted him to sedentary work. (Reply Br. 5 (emphasis added).)

Of course, restrictions concerning a claimant's impairments need only be incorporated "to the extent that the impairment is supported by the medical evidence." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003) (concluding that claimant's claim of continuing absenteeism was not an impairment supported by the medical evidence); *see also Martinez v. Astrue*, No. 11 C 8687, 2012 WL 5830613, at *11 (N.D. Ill. Nov. 16, 2012) (finding that in the absence of any medical support for claimant's stated need to elevate her legs, the ALJ reasonably declined to accept this aspect of her testimony). Here, David fails to point to any medical evidence indicating that his vertigo limits him to a sedentary activities.

As the ALJ observed, the physicians of record who considered David's vertigo–Drs. Charpentier, Sands, Whitley, and Bacchus–all indicated that his vertigo was controlled with medication. (Tr. 305-06, 377, 385.) As a result, David's assertion that his vertigo limits him to sedentary work amounts to no more than his own personal opinion, which is rebutted by the medical opinions of record. *See Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (unpublished) ("There is no presumption of truthfulness for a claimant's subjective complaints; rather, an ALJ should rely on medical opinions based on objective observations and not solely on a claimant's subjective assertions."); *Jones v. Colvin*, No. 09 C 7645, 2013 WL 1407779, at *11 (N.D. Ill. Apr. 8, 2013) (finding that the ALJ reasonably accepted the opinions of the state agency physicians as to claimant's physical limitations where the ALJ considered claimant's symptom testimony but no contrary medical opinions were offered by the claimant).

Perhaps realizing the weakness of his vertigo argument, David changes course in his reply brief, asserting that his "primary argument [for a sedentary RFC] rests on his knee and hand impairments." (Reply Br. 5.) But again David fails to point to any persuasive medical evidence indicating that his knee condition limits him to sedentary activities. He attempts to characterize Dr. Hanna's September 10, 2012, progress note as doing so (Opening Br. 11), but that argument overreaches; Dr. Hanna's work restriction states: "May work *full duty*, but limit deep squatting and bending." (Tr. 448 (emphasis added).) So again David relies merely upon his own personal opinion, rather than medical evidence or opinion, when asserting that his knee condition limits him to sedentary work. *See Knox*, 327 F. App'x at 655 *Jones*, 2013 WL 1407779, at *11.

"The regulations, and this Circuit, clearly recognize that reviewing physicians . . . are

experts in their field, and the ALJ is entitled to rely on their expertise." *Ottman*, 306 F. Supp. 2d at 839 (citing 20 C.F.R. § 404.1527(f)(2)(i)).  Accordingly, the ALJ was entitled to afford significant weight to the opinion of the state agency physicians, Drs. Sands and Whitley, when assigning David an RFC for a reduced range of light work. (*See* Tr. 22-23.)

To reiterate, "the claimant bears the burden of supplying adequate records and evidence to prove [his] claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (emphasis added).  David's assertion that he is limited to sedentary activity is not supported by *any* medical opinions;[7] thus, the Court is able to easily track the ALJ's reasoning concerning his assignment of David's RFC. *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (finding that the ALJ satisfied his "minimal duty to articulate his reasons and make a bridge between the evidence and the outcome as to his step five determination").  Consequently, David's challenge to the RFC does not warrant a remand of the Commissioner's final decision.[8]

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The

---

[7] David asserts that the ALJ should have discounted the opinion of the state agency physicians because the opinions "were proffered more than a year prior to [his] 2012 knee surgery." (Reply Br. 4 n.1.)  But in September 2012 Dr. Hanna released David to return to "full duty" work with limited deep squatting and bending. (Tr. 448.)  Thus, the opinion of the state agency physicians in March and April 2011 is not inconsistent with Dr. Hanna's limitations more than a year later, leaving David's claim of disabling limitations resting solely on his symptom testimony.

[8] David also argues that the ALJ erred at step five by failing to ask the vocational expert whether his testimony conflicts with the Dictionary of Occupational Titles, and then elicit a reasonable explanation for any such discrepancy. *See Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008); *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006).  Although the ALJ did fail to make the requisite inquiry (*see* Tr. 27-35), Social Security Ruling 00-04p "requires only that the ALJ investigate and resolve *apparent* conflicts between the [vocational expert's] evidence and the DOT." *Overman*, 546 F.3d at 463 (emphasis in original).  Here, the only argument David makes with respect to an apparent conflict involves a hypothetical limiting the individual to sedentary work. (Opening Br. 13-14 (citing Tr. 66).)  Because the Court finds that substantial evidence supports the assigned RFC for a reduced range of light work, David's step-five argument premised on a sedentary RFC is moot.

Clerk is directed to enter a judgment in favor of the Commissioner and against David.

      SO ORDERED.

      Enter for this 1st day of April 2015.

                        S/Susan Collins

                        Susan Collins

                        United States Magistrate Judge